847 So.2d 307 (2002)
E. Milton LEWIS III
v.
W. Lawrence OAKLEY et al.
1001847.
Supreme Court of Alabama.
October 4, 2002.
*311 Richard Jordan and Ben Locklar of Richard Jordan, Randy Myers, and Ben Locklar, P.C., Montgomery, for appellant.
John A. Henig, Jr., and Shannon L. Holliday of Copeland, Franco, Screws & Gill, P.A., Montgomery, for appellee W. Lawrence Oakley.
Michael K.K. Choy and Michael C. Skotnicki of Haskell, Slaughter, Young & Rediker, L.L.C., Birmingham, for appellee Morgan Stanley Dean Witter.
Lee H. Zell of Balch & Bingham, L.L.P., Birmingham; and W. Joseph McCorkle, Jr., of Balch & Bingham, L.L.P., Montgomery, for appellee Merrill Lynch, Pierce, Fenner & Smith.
HARWOOD, Justice.
As will be explained later in this opinion, the record in this case is peculiarly structured: one of the contracts at issue was presented to the trial judge in an incomplete, truncated fashion. That contract, an executed written instrument that expressly incorporated by reference the rules, constitutions, and bylaws of various securities organizations, was presented to the trial court in such a way as to omit certain relevant rules otherwise due to form a part of the integrated whole. We have been able to determine this "after the fact," through our own research, but this omission was never disclosed to the trial judge and, in fact, has not been acknowledged in any of the briefs filed with this Court. Of course, "[p]arties may agree to try their case upon a theory of their own choosing and their agreements will be binding." Cotton v. Terry, 495 So.2d 1077, 1080 (Ala.1986). In our role as an appellate court, we review a case based exclusively on the record as compiled in the trial court, and we will not fault or overrule a trial judge based on matters not placed of record before the trial judge. "It is well established that this Court will not consider a case on a theory different from that on which it was tried below." Kmart Corp. v. Bassett, 769 So.2d 282, 284 n. 2 (Ala.2000). Accordingly, our review, and resulting rulings, in this case are limited to the record as the parties chose to constitute it.

I. Factual and Procedural Background

E. Milton Lewis III appeals from an order of the trial court compelling arbitration of his claims against W. Lawrence Oakley, Morgan Stanley Dean Witter ("Morgan Stanley"), and Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch") (hereinafter collectively referred to as "the defendants"), alleging breach of contract and demanding an accounting. We affirm in part and reverse in part.
Lewis began working with Merrill Lynch as a securities dealer/stockbroker in 1966. During his 32 years of employment, he accumulated a "book of accounts"[1] with an approximate value of $182,000,000. In 1998, contemplating retirement, Lewis entered into a "Purchase Agreement" with Oakley, who was also a stockbroker with Merrill Lynch. Lewis agreed to sell his book of accounts to Oakley for $420,000, to be paid in monthly installments of $14,000 per month from April 1, 1998, through *312 September 30, 2000. The Purchase Agreement provided for a significant reduction in the monthly payments in the event the value of the book of accounts fell below $100,000,000. The Purchase Agreement also stipulated that should Oakley "involuntarily separate from service with Merrill Lynch" while the Purchase Agreement was in effect, he would "have no obligation to continue to make payments" to Lewis. Further, Lewis expressly represented in the Purchase Agreement that the Agreement had "been approved by Merrill Lynch." Included in the record as an attachment to "Plaintiff's Opposition to Motions to Dismiss, To Stay, and/or To Compel Arbitration" (hereinafter referred to as the or his "Opposition") filed during the ensuing litigation, is a copy of a February 2, 1998, letter to Lewis from Merrill Lynch's senior resident vice president, Marvin D. Lubin, Jr., stating his understanding of some of the key terms of Lewis's upcoming retirement.[2] Lewis's signature appears at the bottom of the letter under the heading "Acknowledged." Another attachment to the Opposition is an undated document signed by Lewis, Oakley, and Lubin, captioned "Term of Retirement for Mr. E. Milton Lewis." It states that Lewis would transfer his "Book" of clients to Oakley "[o]n March 24, 1998." It also states:
"Milton will be paid $10,500 per month after taxes from April, 1 1998, until September 30, 2000, for his book of clients and his assistance in retaining them. Milton will give his best effort in assisting the facilitation of clients to Lawrence. If for some reason Milton's book of assets were to drop below $100,000,000 and it were mutually agreed upon by Milton Lewis and Lawrence Oakley, Milton's compensation would revert to a 50% payout of computed compensation."
Oakley paid Lewis $14,000 per month for 22 months; however, by letter dated March 16, 2000, Oakley informed Lewis that the value of the book of accounts had dropped below $100,000,000, and that, pursuant to the Purchase Agreement, a reduced payment in the amount of $4,733.26 would be made for February 2000. At the end of March, Oakley ceased working at Merrill Lynch and became a stockbroker for Morgan Stanley. Oakley never made the payment promised for February 2000, and he did not make any further payments. Lewis requested an explanation from Oakley and Merrill Lynch to verify Oakley's claim that the book of accounts had dropped to a value below $100,000,000, a reduction of approximately $82,000,000 in less than two years. Neither Oakley nor Merrill Lynch responded to Lewis's request. In the complaint filed on April 17, 2000, in the Circuit Court of Montgomery County to institute this action against Oakley, Merrill Lynch, and Morgan Stanley, Lewis asserted that on March 29, 2000, Oakley had advised him that Oakley had "voluntarily" left Merrill Lynch, but that his departure had been "hastened" when Merrill Lynch learned of his agreement to accept employment with Morgan Stanley.[3] *313 Lewis averred that Merrill Lynch retained "a significant number of the accounts developed by Plaintiff Lewis that are earning income daily" and that Morgan Stanley, having paid Oakley "a substantial bonus to join its firm," in reliance on the book of accounts, was "greatly benefitting from a great number of said accounts."
Lewis sought damages from Oakley, Merrill Lynch, and Morgan Stanley for breach of contract. He alleged that the "contractual agreement" between him and Oakley had been "approved and ratified by Defendant Merrill Lynch" and that Morgan Stanley was "a `successor' and `assign' under [the] contract and is obligated by the terms thereof." He also sought an accounting from Oakley for all accounts Oakley had purchased from Lewis as of "the first day of each month from January 1, 1998 to date," including "the monthly earnings and commissions paid on each"; a similar accounting from Merrill Lynch for the same period for all accounts "under its management sold by" Lewis to Oakley; and a similar accounting from Morgan Stanley for "all accounts brought under its management by virtue of hiring Defendant Oakley from January 1, 2000 to date." On May 4, 2000, Oakley filed an answer and a counterclaim. As counterclaims, Oakley asserted that Lewis himself had breached the Purchase Agreement and that, as to the clause of the agreement stating that Lewis "represents and warrants [to] use his best efforts to assist [Oakley] in retaining the clients comprising the assets," Lewis was guilty of fraudulent misrepresentation. As Lewis subsequently argued to the trial court when the defendants sought to compel arbitration, the Purchase Agreement contains the following "integration clause" and the following provisions relating to "jurisdiction" and "venue":
"(h) Integration: This Agreement and all other documents expressly contemplated herein, constitute the entire agreement of the parties, as a complete and final integration thereof. All understandings and agreements heretofore had between and among the parties with respect to the subject matter of this Agreement are merged into: (i) this Agreement and (ii) all other documents expressly contemplated herein; which alone fully and completely expresses the parties['] understandings.
". . . .
"(l) Situs: The laws of the State of Alabama shall govern the validity of this Agreement, the construction of its terms, the interpretation of the rights and the duties of the parties, the enforcement of its terms, and all other matters relating to this Agreement.
"(m) Jurisdiction: The jurisdiction over any dispute arising under this Agreement shall be in Montgomery County, Alabama.
"(n) Venue: The venue for any action arising from any dispute under this Agreement shall be with the state or federal court located in Montgomery County, Alabama."
On June 8, 2000, Merrill Lynch filed its "Motion To Stay Pending Arbitration," based on a document Lewis had signed on December 10, 1990, during his employment with Merrill Lynch, a copy of which was attached to the motion. The document was a "Form U-4, Uniform Application for *314 Securities Industry Registration or Transfer" (hereinafter "Form U-4"). It bore the signatures of both Lewis and Lubin, signing on behalf of Merrill Lynch. Paragraph 5 of the Form U-4 stated, in pertinent part:
"I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person that is required to be arbitrated under the rules, constitutions, or bylaws of the organizations indicated in item 10 as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction."
Item 10 of the Form U-4 was completed in such a way as to indicate that Lewis would be registered with the American Stock Exchange ("ASE"), the National Association of Securities Dealers, Inc. ("NASD"), and the New York Stock Exchange ("NYSE"). Merrill Lynch also attached as exhibits to its motion copies of section 10101 of the NASD Code of Arbitration Procedure; section 1101 of article I of the NASD bylaws; article XI, section 1 of the constitution of the NYSE; and Rule 347 of the NYSE. Section 10101 of the NASD Code of Arbitration Procedure reads as follows:
"10101. Matters Eligible For Submission
"This Code of Arbitration Procedure is prescribed and adopted pursuant to Article VII, Section 1(a)(iv) of the By-Laws of the Association for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member, with the exception of disputes involving insurance business of any member which is also an insurance company:
"(a) between or among members;
"(b) between or among members and associated persons;
"(c) between or among members or associated persons and public customers, or others, and
"(d) between or among members, registered clearing agencies with which the Association has entered into an agreement to utilize the Association's arbitration facilities and procedures, and participants, pledgees, or other persons using the facilities of a registered clearing agency, as these terms are defined under the rules of such registered clearing agency."
Article I, section 1101 of the NASD bylaws defines the various terms used in section 10101 of the Code of Arbitration Procedure.
Article XI, section 1 of the constitution of the NYSE states the following:
"Sec. 1. Controversies Arbitrated. Any controversy between parties who are members, allied members or member organizations and any controversy between a member, allied member or member organization and any other person arising out of the business of such member, allied member or member organization, or the dissolution of a member organization, shall at the instance of any party be submitted for arbitration in accordance with the provisions of this Constitution and such rules as the Board may from time to time adopt."
Rule 347 of the NYSE requires the following:
"(a) Except as provided in paragraph (b), any controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative by and with such member or member *315 organization shall be settled by arbitration, at the instance of any such party, in accordance with the arbitration procedure prescribed elsewhere in these rules.
"(b) A claim alleging employment discrimination, including any sexual harassment claim, in violation of a statute shall be eligible for arbitration only where the parties have agreed to arbitrate the claim after it has arisen."
No definitions of terms are provided in the record for the NYSE provisions.
The Form U-4 stated the "main address" of Merrill Lynch as "World Financial Center, 250 Vesey St., New York NY," and the address of the branch office at which Lewis was employed as the Union Bank Tower on Commerce Street in Montgomery. Lewis "checked" various boxes on the form to indicate that he was seeking to be registered with the various selected organizations as a "Full Registration/General Securities Representative," an "Agent," and an "Investment Advisor Rep." He was shown to have been a "Financial Consultant VP" with Merrill Lynch from March 1966 to the date on the Form U-4. Other entries on the Form U-4 indicated that it was being submitted as an amendment to a previously filed Form U-4. As noted, Merrill Lynch signed the agreement by and through Mr. Lubin.
On June 14, 2000, Morgan Stanley filed a motion to dismiss the complaint for failure to state a claim against it, stating that "In the Alternative, Morgan Stanley joins in Merrill Lynch's Motion To Stay Pending Arbitration."[4] In that regard the motion averred:
"[Lewis's] claims against Morgan Stanley are due to be stayed pending arbitration, as outlined in Merrill Lynch's Motion to Stay Pending Arbitration and Memorandum of Law in Support of Merrill Lynch's Motion to Stay Lewis'[s] Claims, filed on June 8, 2000."
On July 31, 2000, the trial court set a hearing on the motion to compel arbitration for August 14, 2000, and instructed "the parties [to] file with the Court at least five (5) days in advance of the above hearing date, any law or supporting materials they wish the court to consider in this matter." On August 1, 2000, Oakley filed a motion stating that he
"hereby joins in the motion to these proceedings pending arbitration which were filed with this court by Defendants Morgan Stanley Dean Witter and Merrill Lynch, on June 14, 2000 and June 8, 2000 respectively. In support hereof, Defendant Oakley adopts and relies upon the brief and evidentiary materials filed by Merrill Lynch and the evidentiary materials filed by Morgan Stanley Dean Witter."
On August 8 the hearing on the motions set for August 14 was continued to August 21. On August 16 Lewis filed his previously mentioned Opposition to the motions to compel arbitration, attaching to it (along with the copies of the Purchase Agreement, Lubin's letter, and the "Terms of Retirement") his own affidavit. In that affidavit, Lewis stated, among other things:
"I began working with Merrill Lynch as a securities broker in 1966. From 1966 until 1998, I put together a book of business or accounts of approximately $182,000,000. Contemplating retirement, I entered into an agreement to *316 sell my book of business to W. Lawrence Oakley, a fellow securities broker with Merrill Lynch in Montgomery, Alabama. Under the agreement, W. Lawrence Oakley was to service the accounts and was to pay me a portion of the commissions for a specified period of time. The agreement was accepted by Marvin D. Lubin, Jr., on behalf of Merrill Lynch."
On the day set for the hearing, Merrill Lynch submitted a "Reply of Merrill, Lynch, Pierce, Fenner & Smith, Inc., To Plaintiff's Opposition to Motion to Dismiss, to Stay, and/or to Compel Arbitration," accompanied by an affidavit of Scott Matisak, administrative manager of Merrill Lynch's "Southland Complex in Montgomery, Alabama," authenticating the Form U-4. Merrill Lynch's reply cited a number of cases, including one from the United States Supreme Court and two from this Court,[5] in support of Merrill Lynch's contention that Forms U-4 per se "involve interstate commerce," and "as a consequence, are enforceable under the Federal Arbitration Act (`FAA'), 9 U.S.C. §§ 1-9" (hereinafter "the FAA"). Merrill Lynch stated its position in that regard as follows:
"There is no need for any evidentiary submission other than the [Form] U-4 executed by Lewis; this matter involves and substantially affects interstate commerce, as a matter of law."
A hearing was convened as scheduled on August 21, 2000, but the record contains no transcript of that proceeding and no order resulted directly from it. Rather, as the trial court explained in its subsequent order of November 2, 2000, "it became immediately clear to the Court" on August 21 that Lewis needed to have access to certain documents in the possession of the defendants, so the court elected to convert the proceeding to a pretrial conference pursuant to Rule 16, Ala. R. Civ. P. There ensued what the court subsequently characterized in its November 2 order as "an open exchange between the Court and the lawyers." Certain document production was then ordered by the court.
Also on August 21 Lewis filed a motion to strike Merrill Lynch's reply and Matisak's affidavit on the ground that they had been filed after the "five days in advance of the hearing" deadline set by the trial court in its July 31 order. Lewis's motion triggered a series of dueling filings. On August 28, 2000, Merrill Lynch countered with two motions. It first moved to strike Lewis's Opposition, claiming that under Lewis's argument it would also be untimely, given the computation of time prescribed by Rule 6(a), Ala. R. Civ. P. It secondly requested leave to file its reply and the Matisak affidavit, if such leave was needed. As grounds it stated that on August 18, the Friday before the hearing scheduled for Monday, August 21, its counsel had contacted Lewis's counsel to ask for his response to Merrill Lynch's motion to compel arbitration and received Lewis's responsive filing later "that afternoon." That response was Lewis's Opposition, date-stamped as having been filed with the circuit clerk at 3:59 p.m. on August 16, and certified by Lewis's counsel as having been sent to all defense counsel that same day via the United States mail. Lewis never contested Merrill Lynch's assertion that it did not receive his Opposition until the Friday before the Monday hearing.
Merrill Lynch further asserted in its motion for leave to file that until it received Lewis's Opposition, it did not know *317 that Lewis would raise any question about the authenticity of the Form U-4. On August 29, Oakley submitted a brief in support of his motion to compel arbitration. On August 30 Lewis submitted his "response" to Merrill Lynch's two motions. On September 1 he filed a motion to strike as untimely Oakley's brief and supporting affidavit. Oakley defended by filing on September 8 his "Reply to Plaintiff's Motion to Strike," attaching his own affidavit and asserting that he had never received a copy of the court's July 31 order setting a filing deadline, which circumstance he declared the trial judge had acknowledged "in open court." His affidavit stated:
"I am a Registered Representative with the New York Stock Exchange and the National Association of Securities Dealers. I have been a Registered Representative with the NYSE since April 28, 1990. I have been a Registered Representative with the NASD since April 28, 1990. As such, I am associated with both the NYSE and NASD."
On September 12, Lewis filed a motion, one aspect of which sought to have Oakley's affidavit stricken on the ground that "even if the Court finds that Defendant Oakley is excused for submitting his materials in support of his motion to stay pending arbitration beyond the time permitted by the Court," the affidavit had not been attached to Oakley's motion or supporting brief, in violation of Rule 6(d), Ala. R. Civ. P. In other aspects of his motion, Lewis revisited his argument that the dispute among the parties arose solely out of the Purchase Agreement, which contained an "entire-agreement" clause, citing and arguing the application to that issue of Ex parte Conference America, Inc., 713 So.2d 953 (Ala.1998); he attached as an exhibit to his motion, and argued the implications of, papers from a March 23, 2000, action Merrill Lynch had instituted against Oakley in federal court, relating to his "March 22, 2000" termination of employment and his immediate association with Morgan Stanley. As the final shot in this salvo, Merrill Lynch rejoined with its own motion, attempting to distinguish Ex parte Conference America, attaching its own copy of the papers in the federal action, and attaching a copy of NASD Rule 10335, relating to injunctive relief.
On November 2, 2000, the trial court entered the aforementioned order relating to discovery issues. On November 28, 2000, it entered a follow-up order referencing its in camera review of certain discovery materials submitted by Merrill Lynch and Oakley, and directing them to retain possession of those materials pending further orders. On April 10, 2001, both Morgan Stanley and Oakley filed motions reasserting that the case was due to be stayed and the disputes arbitrated.
On June 14, 2001, the trial court entered an order referring the controversy to arbitration and dismissing the case with prejudice. As a preamble to its findings of fact, the court explained that the matter was before it on the respective motions to compel arbitration and that it had "heard counsel for the parties argue the motions on several occasions." The order went on to state, in pertinent part, as follows:
"Lewis is a former Merrill Lynch employee and a former National Association of Security Dealers and New York Stock Exchange Registered Representative. Defendants Morgan Stanley Dean Witter and Merrill Lynch are Registered Broker-Dealers and member firms of the National Association of Security Dealers and New York Stock Exchange. Lawrence Oakley is also a National Association of Security Dealers and New York Stock Exchange Registered Representative.

*318 "In December of 1990, while employed at Merrill Lynch, Milton Lewis executed a Uniform Application for Securities Industry Registration ([F]orm U-4). Paragraph 5 of [Form] U-4 provides `I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer or any other person that may require to be arbitrated under the rules, constitutions or bylaws of the organization indicated in item 10....' Two of the items listed in item 10 are the National Association of Security Dealers and the New York Stock Exchange.
"There was no arbitration provision in the contract between Milton Lewis and Lawrence Oakley. The Court is of the opinion that had Lawrence Oakley been the only Defendant in this case the Court would have had concerns about granting a Motion to Compel Arbitration. The Court has requested the parties to attempt to negotiate a resolution of their dispute and the parties have been unsuccessful in resolving the issues that are now pending in the above-referenced matter.
"The Court is of the opinion that Lewis'[s] claims are subject to arbitration; It is therefore, ORDERED, ADJUDGED and DECREED as follows:
"1. The Court wishes the parties to explore arbitrating in Montgomery County, Alabama, the matters in dispute between the parties. The Court desires this for several reasons including the Court's wishes to have this matter resolved quickly and as economically feasible as possible. Therefore, the parties shall report to the Court within seven (7) days of the date of this order as to whether or not they will arbitrate this matter in Montgomery County, Alabama, and, if so, the procedures under which the matter will be arbitrated.
"2. If the parties are unable to reach an agreement then it is ordered that all matters of the complaint and counterclaim and any other dispute between the parties shall be submitted to arbitration within ninety (90) days of this order, pursuant to the terms and conditions of the agreements executed by Lewis. Accordingly, this case is hereby DISMISSED with prejudice."
On July 17, 2001, Lewis appealed to this Court. On October 23, 2001, upon joint motion by the parties, Merrill Lynch was dismissed as a party to the appeal.

II. Standard of Review

This Court's review of a grant or denial of a motion to compel arbitration is de novo. See W.D. Williams, Inc. v. Ivey, 777 So.2d 94 (Ala.2000); Patrick Home Ctr., Inc. v. Karr, 730 So.2d 1171 (Ala. 1999). Therefore, this Court must determine "whether the trial judge erred on a factual or legal issue to the substantial prejudice of the party seeking review." Ex parte Roberson, 749 So.2d 441, 446 (Ala.1999).

III. Lewis's Issues On Appeal

In his initial brief to this Court, Lewis's "Statement of the Issues" set forth five questions for appellate determination. In his subsequent reply brief, he reiterated those questions and added a sixth one. As thus finally constituted, his issues for review were stated as follows:
"A. Did the trial court err by ordering the parties to submit their disputes to arbitration where the agreement at issue between a current and retired stockbroker does not include an arbitration provision and, to the contrary, the agreement includes a provision that contemplates litigation in the event of a dispute between the parties?

*319 "B. Did the trial court err by ordering the parties to arbitrate their disputes where the Appellees (defendants in the case below) failed to establish an agreement to arbitrate and failed to establish that the Purchase Agreement or the dispute arising out of that agreement substantially affects interstate commerce?
"C. Did the trial court err by ordering the parties to arbitrate their disputes where the contract at issue does not contain an arbitration provision and, instead, includes an `integration' or `entire agreement' provision?
"D. Did the trial court err by ordering the parties to arbitrate their disputes where the evidence establishes that Lawrence Oakley waived his right to arbitrate by substantially invoking the litigation process?
"E. Did the trial court err by dismissing the causes of action brought against the Appellees in this cause where the Appellant properly stated claims against the Appellees?
"F. In the event the Court determines that the claims against Merrill Lynch and/or Morgan Stanley are to be submitted to arbitration, are the claims against Lawrence Oakley so intertwined with those claims to warrant submission of all claims to arbitration or are the claims against Lawrence Oakley properly severable and triable to a jury apart from the claims against the other Defendants?"
Those issues can be rephrased as follows:
1. Was the Form U-4 sufficiently authenticated as a contract signed by Lewis?
2. Did the Form U-4 (being the contract containing the arbitration provision) or the transaction it evidenced involve interstate commerce to the requisite degree, i.e., did either or both substantially affect interstate commerce?
3. Can the disputes Lewis alleges in his complaint be said to arise out of the Form U-4 or the transaction evidenced by it, or must they be deemed to arise solely out of the Purchase Agreement?
4. What is the legal effect on the Form U-4 of the "integration" or "entire-agreement" provision in the Purchase Agreement?
5. Did Oakley's participation in the case from the time he filed his answer and counterclaim (May 4, 2000) until he filed his joinder in the pending motions to compel arbitration (August 1, 2000) represent a substantial invocation of the litigation process?
6. If Merrill Lynch and/or Morgan Stanley are entitled to compel arbitration, should the claims against Oakley also be arbitrated under the doctrine of "intertwining"?

IV. Inapplicability of NASD Code of Arbitration Procedure

As noted, the record contains a copy of section 10101 of the NASD Code of Arbitration Procedure, captioned "Matters Eligible For Submission" (emphasis added). This is the only section of that code placed in the record, and the defendants relied on it only in arguing to the trial court their entitlement to demand arbitration through the NASD, and likewise have argued only it on appeal as the basis for mandatory arbitration under the auspices of the NASD. However, we have discovered through our independent research that another section of the Code of Arbitration Procedure specifies, as a subset of the matters merely eligible for arbitration under section 10101, those matters for which *320 arbitration can be required That other section of the code is 10201.
"Rule 10101 of the NASD Code expansively defines the issues and subject matters that may be arbitrated.... Rule 10201(a) of the NASD Code in turn describes a subset of issues as to which certain specified parties may compel arbitration.... Accordingly, unless [the party moving for arbitration] is a party that can avail itself of Rule 10201, it has no power to force the [dispute] to arbitration, regardless of whether the substantive dispute is eligible for submission pursuant to Rule 10101."
Burns v. New York Life Ins. Co., 202 F.3d 616, 619 (2d Cir.2000). "Rule 10101 `defines the general universe of issues that may be arbitrated'.... Rule 10201 mandates arbitration for [a] subset of the universe of disputes outlined in Rule 10101...." Williams v. Imhoff, 203 F.3d 758, 762-63 (10th Cir.2000) (footnote omitted).
"Rule 10101 merely defines which disputes are eligible for arbitration. The next issue is whether a given dispute is required to be arbitrated. Remember, a person who submits a Form U-4 merely agrees `to arbitrate any dispute ... that is required to be arbitrated under the rules, constitutions, or by-laws of the [NASD] as may be amended from time to time.'"
Jin v. Metropolitan Life Ins. Co., (No. 95 Civ. 4427) (S.D.N.Y., April 4, 2000)(not published in F.Supp.). Rule 10201 is entitled "Required Submissions." See, e.g., Burns, 202 F.3d at 619.
"Rule 10101 of the NASD Code ... expansively defines the matters that may be eligible for arbitration....
". . . .
"NASD Rule 10201(a) in turn describes a narrower range of matters as to which certain specified parties may compel arbitration....
"Thus, Rule 10101 describes `the scope of permissive arbitration,' while `Rule 10201 limits the scope of mandatory arbitration to disputes that are initiated by certain classes of persons ... against specified classes of persons and that are "between [a limited class of parties]."'"
Goldstein v. Visconti, (No. 00 Civ. 5729)(S.D.N.Y., May 31, 2001)(not published in F.Supp.).
Although we have access to the text of certain versions of Rule 10201 as that rule existed at different times, as set out in the cases cited above, we cannot take judicial notice of rules promulgated by a national securities organization just because they were properly made a part of the record in a case in another jurisdiction. "`The NASD is a registered national securities association with congressionally delegated self-regulatory authority.'" J.C. Bradford & Co. v. Vick, 837 So.2d 271, 275 (Ala.2002) (quoting Merrill Lynch, Pierce, Fenner & Smith v. National Ass'n of Sec. Dealers, Inc., 616 F.2d 1363, 1365 (5th Cir.1980)). See also Austin Mun. Sec., Inc. v. National Ass'n of Sec. Dealers, Inc., 757 F.2d 676 (5th Cir.1985), for a fuller discussion of the nature, status, and structure of the NASD. Nothing in the record in this case alludes in any way to Rule 10201, and, from all that appears, none of the parties were aware of its existence, or, if they were, they chose not to broach it with the trial court.
For all of these reasons, we conclude that the trial judge could not properly have based his ruling compelling arbitration on the purely permissive, but not mandatory, scope of arbitration of Rule 10101 of the NASD Code of Arbitration Procedure.

*321 V. Contractual Status of the Form U-4

As previously noted, Lewis moved to strike the Matisak affidavit authenticating the Form U-4 on the basis that it was filed after the deadline set by the court's July 31, 2000, order, whereby "any law or supporting materials" the parties wished the court to consider were to be filed at least five days in advance of the scheduled August 14 hearing date. This proposition was the sole ground asserted by Lewis in support of his motion.[6]
As also previously noted, the hearing was continued from August 14 to August 21, and on August 21 no hearing on the motions to compel arbitration was conducted; rather, the trial judge elected instead to conduct a pretrial conference. There then followed various events, court filings, another hearing, and two interim court orders, and it was not until June 14, 2001, that the trial court, after noting that it had "heard counsel for the parties argue the motion [to compel arbitration] on several occasions," ordered the dispute to arbitration. Lewis has never taken the position that his purported signature, appearing at four different places on the Form U-4, is not his; he has simply contended that the authenticating Matisak affidavit should be disregarded and that, without it, the defendants failed to prove he was a signatory to the Form U-4. He has never challenged the authenticity or effectiveness of the signing by Mr. Lubin on behalf of Merrill Lynch. Matisak's affidavit satisfies the standard for authentication stated in Rule 901, Ala. R. Evid., and was therefore sufficient to authenticate Lewis's signatures on the From U-4, if the affidavit was eligible for consideration by the trial court. The trial court never expressly ruled on Lewis's motion to strike the affidavit or on Merrill Lynch's August 28, 2000, motion for leave to file its reply, including the affidavit, if such leave were needed. This Court has held that Rule 6(d), Ala. R. Civ. P., "allows the trial court discretion to permit the service of affidavits [in support of a motion for summary judgment] that might otherwise be untimely, and its decision to accept such affidavits will not be reversed absent an abuse of discretion." Middaugh v. City of Montgomery, 621 So.2d 275, 279 (Ala.1993). Rule 6(d) thereby "qualifies Rule 56(c) [Ala. R. Civ. P.] by placing it within the trial court's discretion to permit, or refuse to consider, an affidavit that is untimely." Speer v. Pin Palace Bowling Alley, 599 So.2d 1140, 1142 (Ala.1992). Rule 6(b), Ala. R. Civ. P., provides as follows:
"(b) Enlargement. When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order, or (2) upon motion made after the expiration of the specified period *322 permit the act to be done where the failure to act was the result of excusable neglect; but it may not extend the time for taking any action under Rules 50(b), 52(b), 59(b), (d), and (e), and 60(b), except to the extent and under the conditions stated in them."
The text of Rule 6(b) of the Federal Rules of Civil Procedure is identical to that of Rule 6(b) of the Alabama Rules of Civil Procedure. In discussing its application to situations such as is involved in this case, federal treatise writers have commented as follows:
"According to Rule 6(d), any affidavits in support of the summary-judgment motion also should be served at the time the motion is served, unless the court exercises its discretion under Rule 6(b) and permits later service. Rule 6(b), which is a rule of general application, provides in part: `When by these rules... an act is required or allowed to be done at or within a specified time, the court for cause shown may ... upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect....' This passage gives the judge authority to accept a tardy affidavit when it is appropriate to do so. One court has held that Rule 6(d) requires the court to strike an affidavit not served with the motion, but this holding does not comport with later decisions interpreting Rules 6 and 56."
10A Charles Alan Wright et al., Federal Practice and Procedure § 2719 (3d ed.1998) (footnotes omitted).
"An affidavit in support of a motion must be served with the motion. Opposing affidavits in response to a motion may be served until one day before the hearing, unless the court establishes a different time period for service. The court may use its discretion to accept late affidavits, but may require that cause or excusable neglect be shown to account for the delay."
1 James W. Moore et al., Moore's Federal Practice § 6.08[1] (3d ed.1997)(footnotes omitted).
Furthermore, Rule 6(e), Ala. R. Civ. P., provides:
"(e) Additional Time After Service by Mail. Whenever a party has the right or is required to do some act or take some proceeding within a prescribed period after the service of a notice or other paper upon the party and the notice or paper is served upon the party by mail, three (3) days shall be added to the prescribed period."
Merrill Lynch's filing of its reply to Lewis's Opposition must also be viewed in light of this rule and Rule 6(a), which excludes intermediate Saturdays and Sundays from the computation of time when the time prescribed or allowed is less than 11 days.
We will assume that the trial court considered the Matisak affidavit in ruling on the motions to compel arbitration. We deem it to have properly exercised its discretion in that regard, given the cumulative effect of the following considerations: the moving target of hearing dates to which the court's initial order requiring filings to be made five days in advance of the hearing could relate; the "eleventh hour" service of Lewis's Opposition; the discretion a trial court has to amend provisions of interlocutory orders; the filing by Merrill Lynch of its "request for leave to file reply," stating grounds; the fact that the affidavit raised no new issue and that Lewis never actually challenged the authenticity of his signatures appearing on the Form U-4; Lewis's filing of additional evidentiary submissions with the court as late as September 12, 2000; and the trial court's express finding in its June 14, 2001, order that "[i]n December of 1990, while *323 employed at Merrill Lynch, Milton Lewis executed a Uniform Application for Securities Industry Regulation (Form U-4)." (Emphasis supplied.) Thus the trial court acted within its discretion in considering the Matisak affidavit and in concluding, based on it, that the Form U-4 had been executed by Lewis. That being so, we proceed to analyze the entirety of the contract it created.
Concerning the existence of that contract, composed of, in Lewis's words in his Opposition, "a Form U-4 purportedly signed by Milton Lewis and regulatory provisions of the National Association of Securities Dealers (`NASD') and the New York Stock Exchange (`NYSE')," we note that before the trial court Lewis challenged only the authentication of the Form U-4. At no place in his Opposition and at no time over the course of his numerous other submissions to the trial court did he suggest to the trial court that the NASD and NYSE regulatory provisions exhibited to Merrill Lynch's motion to compel arbitration were not in full force and effect, or that any pertinent associated regulatory provisions had been omitted. Likewise, he raises no argument in this Court to the effect that those regulatory provisions were not properly established as parts of the contract effected by execution of the Form U-4. Rather, in that regard, he argues on appeal only that the Form U-4 was not properly authenticated. Therefore, we consider the Form U-4 and the NYSE provisions placed in the record in analyzing "the contract" thereby created.
One can infer from the record that after the Form U-4 was signed by Lewis and Merrill Lynch, it was submitted to both the NASD and the NYSE in due course and that Lewis was accepted for registration by both organizations. Among other things, when Merrill Lynch filed its motion to compel arbitration on June 8, 2000, more than two years after Lewis's retirement, it described him as "a former NASD and NYSE Registered Representative." When Lewis filed his opposing affidavit approximately two months later, he stated he had been a "securities broker" with Merrill Lynch from 1966 until 1998, but denied that the dispute between the parties arose out of his "previous affiliation with the National Association of Securities Dealers or the New York Stock Exchange." Because, for the reasons previously explained, the NASD Code of Arbitration Procedure cannot be looked to as a basis for the arbitration the trial court ordered, we will consider in the remainder of this opinion only NYSE constitution article XI, section 1, and NYSE Rule 347.
The Form U-4 arbitration provision committed Lewis "to arbitrate any dispute, claim or controversy" between him and Merrill Lynch "or any other person" that was required to be arbitrated under the rules, constitution, or bylaws of the NYSE, as those documents "may be amended from time to time." Thus, a contract of a continuing nature, and potentially evolving over time, was created between Lewis and the NYSE.

VI. Does a Form U-4 Affect Interstate Commerce?

"A party who moves to compel arbitration bears the initial burden of establishing by substantial evidence (1) the existence of an agreement to arbitrate in (2) a contract or transaction substantially affecting interstate commerce."
Ex parte Cain, 838 So.2d 1020, 1026 (Ala. 2002).
This Court has had four occasions to consider arbitration issues arising out of a Form U-4: Ex parte McKinney, 515 So.2d 693 (Ala.1987); Ex parte Hagan, 721 So.2d 167 (Ala.1998); SouthTrust Sec., Inc. v. McClellan, 730 So.2d 620 (Ala.1999); and *324 Allmerica Fin. Life Ins. & Annuity Co. v. Miller, 775 So.2d 132 (Ala.2000). No issue of interstate involvement was addressed in McKinney. The Court did note, however, that by executing a Form U-4, among other contracts, "McKinney agreed to comply with and be bound by the constitution and rules of the New York Stock Exchange and to submit to its jurisdiction." 515 So.2d at 697. No question of interstate involvement was addressed in Hagan. In McClellan, the Court noted in a footnote that "[n]either party has alleged that the transaction did not involve interstate commerce." 730 So.2d at 621 n. 1. Finally, in Allmerica Financial there was no question raised concerning the effect of the transaction in that case on interstate commerce. Thus, this Court has not been squarely presented with the issue whether registration by a securities broker with national securities organizations pursuant to a Form U-4 affects interstate commerce as a given. Merrill Lynch was correct in its assertion to the trial court that numerous jurisdictions have held that a Form U-4 per se affects interstate commerce (although the initial broad statements of that proposition in the earliest of those cases could properly be interpreted in a more narrow fashion, given the precise issue being dealt with). See Legg, Mason & Co. v. Mackall & Coe, Inc., 351 F.Supp. 1367, 1370 (D.D.C.1972) ("There is no doubt that the contract between the parties to arbitrate controversies under the Constitution and Rules of the New York Stock Exchange evidences a `transaction involving commerce' within the meaning of section 2 of the [Federal Arbitration] Act."); Austin Mun. Sec., Inc. v. National Ass'n of Sec. Dealers, Inc., 757 F.2d 676 (5th Cir.1985); Smiga v. Dean Witter Reynolds, Inc., 766 F.2d 698, 704 (2d Cir.1985) ("In addition, since Smiga's contract with the NYSE contemplates using interstate communication facilities and engaging in interstate activities, in our view, the arbitration clause in Smiga's agreement with the NYSE was part of a `contract evidencing a transaction involving commerce' within the meaning of 9 U.S.C. § 2.") (emphasis added); Willis v. Dean Witter Reynolds, Inc., 948 F.2d 305, 307 (6th Cir.1991) ("In Gilmer [v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991) ] the Supreme Court held that the same arbitration clause, contained in the same securities registration form [Form U-4] and New York Stock Exchange rule [Rule 347], was enforceable under the Federal Arbitration Act...."); Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 85 N.Y.2d 173, 180, 647 N.E.2d 1298, 623 N.Y.S.2d 790 (1995) ("Under settled law, the arbitration of disputes concerning employment in the securities industry and the enforceability of the arbitration clause embodied in the petitioners' U-4 Form applications are governed by the Federal Arbitration Act...."); Bradford v. J.C. Bradford & Co. (In re Bradford), 181 B.R. 910, 913 (Bankr.E.D.Tenn.1995) ("Pursuant to the [Form] U-4 when a person registers with the NYSE or the NASD, the registrant becomes a party to a contract among the members (`membership agreement'). The membership agreement includes the organization's arbitration rules. The membership agreement also evidences a transaction in interstate commerce. That makes the membership agreement and the parties to it subject to the Federal Arbitration Act.") (citations omitted); Williams v. Cigna Fin. Advisors, Inc., 56 F.3d 656, 659 (5th Cir.1995) ("Williams' [Form] U-4 Registration is a contract involving the sale of securities and thus involves commerce."); Hart v. Canadian Imperial Bank of Commerce, 43 F.Supp.2d 395, 399 (S.D.N.Y.1999) ("It is well established that a signed Form U-4 constitutes an express arbitration agreement enforceable under the FAA.").
*325 Although this Court has thus far declined to adopt a per se interstate-involvement rule in other contexts, see, e.g., Liberty National Life Insurance Co. v. Douglas, 826 So.2d 806 (Ala.2002), and Jim Burke Automotive, Inc. v. McGrue, 826 So.2d 122 (Ala.2002), we are here presented with a contract evidencing a transaction that is quintessentially interstate in nature. Lewis was a stockbroker employed by Merrill Lynch, a nationwide securities firm and a member of both the NASD and NYSE. We take judicial notice of the fact that they are national securities organizations. By virtue of his registration with them, pursuant to the Form U-4, Lewis was authorized to trade securities on a nationwide basis. In that regard, he was able to continue working as a stockbroker for Merrill Lynch, which he characterizes in his complaint as "a foreign corporation." In his affidavit, he acknowledges that he became affiliated with both the NASD and the NYSE.
Thus, the record supplies adequate proof that the Form U-4 executed by Lewis and the transaction it evidenced substantially affected interstate commerce. Lewis, as a result of his 1990 Form U-4 registrations, was put in a position to continue his activities as a stockbroker with Merrill Lynch for another eight years, until he voluntarily retired. As he stated in his complaint, his career with Merrill Lynch was so successful that, by the time of his retirement, he had "developed a book of accounts of approximately $182,000,000." He could not have engaged in that career had he not become affiliated with the NASD and the NYSE through the Form U-4. Thus, "the transaction" evidenced by the Form U-4 had a substantial effect on interstate commerce.

VII. Can the Dispute Lewis Asserts Be Said to Arise Out of the Form U-4 or the Transaction Evidenced by It?

As noted earlier, "the contract" at issue in this case consists only of the materials the parties placed of record, which, as far as the NYSE materials are concerned, were article XI, section 1 of its constitution and Rule 347. However, from our reading of cases from other jurisdictions and our review of materials available on the NYSE's Internet Web site, we find that there exists, and did at all times pertinent to this case, an additional set of rules of the NYSE dedicated to arbitration. See, e.g., Spear, Leeds & Kellogg v. Central Life Assurance Co., 85 F.3d 21 (2d Cir. 1996), and Lehman Bros. v. Certified Reporting Co., 939 F.Supp. 1333 (N.D.Ill. 1996); and the "600 series" of NYSE Rules of Arbitration.[7] Because Rules 600 through 639 of the NYSE Arbitration Rules were never called to the attention of the trial court and were discovered by us by a means completely outside of the record, they can play no part in our further analysis of "the contract" in this case. That contract, as represented to the trial court, provided in its entirety as follows: pursuant to the Form U-4, Lewis agreed to arbitrate any dispute, claim or controversy that might arise between him and his firm, Merrill Lynch, "or any other person," insofar as the same was "required to be arbitrated under the rules, constitutions, or bylaws" of the NYSE. Article XI, section 1 of the NYSE constitution, required to be arbitrated, as pertinent to this case, "any controversy between a member, allied member or member organization and *326 any other person arising out of the business of such member, allied member or member organization." NYSE Rule 347 required to be arbitrated "any controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative by and with such member or member organization." Merrill Lynch and Morgan Stanley represented to the trial court that they were both, as stated in Merrill Lynch's motion to compel arbitration, "member firms of the NASD and NYSE." In its order of June 14, 2001, the trial court expressly declared that "Morgan Stanley Dean Witter and Merrill Lynch are Registered Broker-Dealers and member firms of the National Association of Security Dealers and the New York Stock Exchange." Lewis does not challenge that finding on appeal.
Turning to the contract constituted by the Form U-4 and NYSE constitution, art. XI, sec. 1, we determine that Lewis agreed to arbitrate any dispute that might arise between him and Merrill Lynch, and/or him and "any other person" arising out of the business of Merrill Lynch and/or Morgan Stanley.[8] An important aspect of our analysis of the scope and reach of this contract is the meaning we ascribe to the phrase "arising out of the business" of a NYSE member organization. Instructive is the treatment we accorded the phrase "arising out of ... employment" in SouthTrust Securities, Inc. v. McClellan, 730 So.2d 620 (Ala.1999). That phrase was at issue in that case as a part of the NASD Code of Arbitration Procedure Section 10201, which requires to be arbitrated disputes "arising out of the employment or termination of employment" of a stockbroker. (The entire NASD Code of Arbitration Procedure was placed in the record by the parties in that case, including both Rule 10101 and Rule 10201.) This Court stated:
"The key to this case is the interpretation of the phrase `arising out of ... employment.' The United States Supreme Court has stated that courts must construe arbitration agreements broadly, resolving all doubts in favor of arbitration. Moses H. Cone Mem'l Hosp. [v. Mercury Constr. Corp.], 460 U.S. [1] at 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 [(1983)]. A broad construction of the term `employment' is particularly appropriate in this case, given the precedents of the Supreme Court of the United States strongly advancing arbitration of all disputes related to the securities industry."
730 So.2d at 622 (emphasis added).
A similar sentiment was expressed in Pearce v. E.F. Hutton Group, Inc., 828 F.2d 826, 829 (D.C.Cir.1987):
"The rationale for this policy [of broadly resolving all doubts in favor of arbitration] is at its strongest where the arbitration will be governed by procedures specifically tailored to the context from which the agreement to arbitrate arises, and will be conducted by arbitrators who are expert in the norms and practices of the relevant industry. Labor arbitration is one such context. The arbitration system of the New York Stock Exchange is another."
The parties have not directed us to any cases construing the phrase "arising out the business of" a member organization. That is easily understandable on Lewis's part; he takes the position *327 that the contract formed by combining Form U-4 and NYSE article XI, section 1, is irrelevant and undeserving of discussion as to its meaning, because, he says, his claims arise exclusively out of the Purchase Agreement. Through our independent research we have found a few cases from other jurisdictions that have considered the scope of "arising out of the business of" as informed by the interaction of art. XI, section 1, and NYSE arbitration Rule 600(a), e.g., Paine, Webber, Jackson & Curtis, Inc. v. Chase Manhattan Bank, N.A., 728 F.2d 577 (2d Cir.1984), but no cases have attempted to interpret the phrase as it might exist in a contract involving only art. XI, section 1. Accordingly, again given the peculiar structuring of "the contract" in the record, we chart our own course.
"Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning."
Homes of Legend, Inc. v. McCollough, 776 So.2d 741, 746 (Ala.2000) (citations omitted). Here, the whole of the contract (ignoring for the time being Rule 347) is formed by the combination of Form U-4 and art. XI, section 1. There is no suggestion in the record or in the parties' briefs to this Court that the term "any other person," as used respectively in Form U-4 and art. XI, section 1, or the term "business," as used in art. XI, section 1, are used in a special or technical sense. Using the ordinary, plain meanings of those terms and being mindful of the special rules of construction that must guide our analysis of an arbitration clause, we conclude that the dispute, claim, or controversy in this case can fairly be said to exist between Lewis and Merrill Lynch ("my firm"), and also between him and Oakley and Morgan Stanley ("any other person" per the Form U-4), and represents a "controversy between a member organization" (Merrill Lynch and Morgan Stanley, respectively) and "any other person," i.e., in this instance, Lewis.
The dispute, as framed by the complaint, arises in several substantial respects out of the business of Merrill Lynch and Morgan Stanley, respectively. It was Lewis's $182,000,000 book of accounts with Merrill Lynch that was being taken over by Oakley. It was the alleged decline in the value of that book of accounts, while maintained as a part of the business of Merrill Lynch and traded in by its then stockbroker employee Oakley, that was the genesis of the dispute between Lewis, on the one hand, and Oakley and Merrill Lynch, on the other. When Oakley thereafter "jumped ship" to Morgan Stanley, he "began soliciting Defendant Merrill Lynch's clients, most of whom were customers developed by Plaintiff Lewis," according to Lewis's complaint. Lewis asserts in his brief to this Court that "[n]ow, Lawrence Oakley works for Morgan Stanley and he has transferred about $15,000,000 of the book of business to Morgan Stanley," citing the trial court's statement in its November 2, 2000, order that "Defendant Oakley provided only a single page with notes [pursuant to court-ordered production] indicating that $15,000,000 of the accounts had been transferred to Morgan Stanley." The trial court further noted in that order that Lewis's counsel had written a letter to it on September 6, 2000, reporting his suspicion "that Merrill Lynch reassigned Milton Lewis'[s] accounts after changing account numbers, further frustrating discovery." Lewis queried in his Opposition, after remarking on the $82,000,000 depreciation in the book of accounts: "Did Oakley convert some of that business to [Morgan Stanley]? *328 If so, did [Morgan Stanley] benefit from that transfer and, if so, to what degree?"
Two pivotal issues in the resolution of this whole controversy will be whether the decline in the value of the book of accounts was legitimate, so as to entitle Oakley under the express terms of the Purchase Agreement to reduce his payments, and whether Oakley "involuntarily separate[d] from service with Merrill Lynch," so that, again under the express terms of the Purchase Agreement, he would "have no obligation to continue to make payments to [Lewis]."
The Purchase Agreement itself was a part of the business of Merrill Lynch, given Lewis's characterization of Merrill Lynch's involvement in the structuring and execution of the Purchase Agreement and the implementation of its terms. Lewis asserted in his complaint that all three defendants breached the Purchase Agreement by virtue of their various roles in the way it was carried out, and he sought monetary damages from all three; furthermore, as described earlier, Lewis sought an accounting separately from each defendant for their business relating to the book of accounts, starting with January 1, 1998. Thus, "the dispute" as presented by Lewis, arises out of the business of Merrill Lynch and the business of Morgan Stanley.
Given our disposition of the Form U-4/article XI, section 1, "contract issue," we pretermit any separate analysis vis-à-vis the combined effect of Form U-4/Rule 347.

VIII. Standing of the Defendants to Compel Arbitration

Lewis does not challenge on appeal the standing of any of the defendants to compel arbitration under the Form U-4/NYSE constitution art. XI, section 1, contract (electing instead, as already noted, to put all of his eggs in one basketthat the dispute arises solely out of the Purchase Agreement), so we have no appellate issue presented in that regard. See Rule 28, Ala. R.App. P.; and Gonzalez v. Blue Cross/Blue Shield of Alabama, 689 So.2d 812, 819 (Ala.1997) ("`When an appellant fails to properly argue an issue, that issue is waived and will not be considered on appeal.'") (quoting Sullivan v. Alfa Mut. Ins. Co., 656 So.2d 1233 (Ala.Civ.App.1995)). Nonetheless, Oakley makes the point in his brief to this Court that, given Merrill Lynch's status as a signatory, he would have standing by virtue of the doctrine of equitable estoppel, also sometimes referred to as the doctrine of intertwining. We will briefly address that issue. As recently reiterated in Ex parte Lovejoy, 790 So.2d 933, 937 (Ala.2000), quoting First Family Fin. Servs., Inc. v. Rogers, 736 So.2d 553, 560 (Ala.1999):
"`"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."` A T & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting United Steelworkers v. Warrior & Gulf Navig. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). Pursuant to the doctrine of equitable estoppel, a plaintiff may be compelled to arbitrate his or her claims against a nonsignatory to a contract containing an arbitration provision if the claims `are founded on, and are intertwined with, the facts surrounding the underlying contract that contains the arbitration clause.' Ex parte Dyess, 709 So.2d 447, 451 (Ala.1997). Specifically, claims against a nonsignatory to a contract containing an arbitration provision are `founded on, and are intertwined with, the facts surrounding the underlying contract,' id., (1) where the plaintiff *329 asserts breach of duty imposed or entailed by that contract, or (2) where the plaintiff alleges conspiracy or agency between a nonsignatory and a signatory to a contract containing an arbitration clause. Ex parte Isbell, 708 So.2d 571 (Ala.1997). See also MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir.1999)."
See also Ex parte Stamey, 776 So.2d 85, 89 (Ala.2000), and Ex parte Napier, 723 So.2d 49, 53-54 (Ala.1998). The description in "the contract" of the parties entitled to arbitration is, as already shown, clearly broad enough to include Oakley. Hence Oakley has shown himself alternatively entitled to compel arbitration under this doctrine.

IX. The "Integration" or "Entire-Agreement" Provision in the Purchase Agreement

An "integration" or "entireagreement" clause, sometimes referred to as a "merger" clause, applies only to contracts between the same parties. Belmont Homes, Inc. v. Law, 841 So.2d 237 (Ala. 2002). The "integration" paragraph of the Purchase Agreement undertakes to merge into that agreement all prior agreements "between and among the parties," who are specifically identified as Lewis and Oakley. Hence, the Form U-4, not being an agreement between the same parties, was not affected by the integration clause.

X. Oakley's Invocation of the Litigation Process

As the first defendant to respond to the complaint, Oakley filed an "Acceptance of Service, Answer and Counterclaim." He took no further action in the case, as far as the record reveals, until three months later when he filed his joinder in the motions to compel arbitration filed by Merrill Lynch and Morgan Stanley. Lewis argues to us that Oakley, by asserting a counterclaim predicated on the Purchase Agreement, "conceded that the dispute ... arose out of" that agreement and showed his intent to abandon any right to arbitration. The burden was on Lewis to prove that Oakley had substantially invoked the litigation process, in order to show a waiver by Oakley of his right to compel arbitration. Blue Ribbon Homes Super Center, Inc. v. Bell, 821 So.2d 186 (Ala.2001). "Our cases continue to make it clear that, because of the strong federal policy favoring arbitration, a waiver of the right to compel arbitration will not be lightly inferred, and, therefore, that one seeking to prove waiver has a heavy burden." Mutual Assurance, Inc. v. Wilson, 716 So.2d 1160, 1164 (Ala.1998). Even if we were to conclude that Oakley had substantially invoked the litigation process, which we do not, Lewis has not met his burden of showing that he was substantially prejudiced thereby. See Jericho Mgmt., Inc. v. Fidelity Nat'l Title Ins. Co., 811 So.2d 514, 515 (Ala.2001). Lewis asserts in his brief to this Court that he was "prejudiced by having to pay attorneys' fees in answering the counterclaim and submitting discovery requests associated therewith." We see in the record, however, that Lewis's answer to the counterclaim consisted of essentially a onepage set of general denials, and the discovery he references was a three-category set of document production requests and 12 interrogatories, all of which appear directed to the issues raised by the complaint, as opposed to the counterclaim. We conclude that the trial court acted within its discretion in implicitly finding that Oakley had not substantially invoked the litigation process and/or that Lewis was not substantially prejudiced by the level of the litigation process that was invoked.

*330 XI. Conclusion

Through the process of all of the analysis above, we conclude that the order of the trial court is due to be affirmed to the extent it ordered the dispute underlying this litigation to arbitration. To the extent it dismissed the case with prejudice, however, its order is reversed. Only Morgan Stanley, among the parties, sought that relief, and only on a basis independent of its motion to compel arbitration. Because Lewis has raised the dismissal with prejudice as an issue on appeal, this case is distinguishable from Porter v. Colonial Life & Accident Ins. Co., 828 So.2d 907 (Ala.2002). In this case, the dispute will now be referred to the NYSE for arbitration pursuant to its procedures. However, we are aware from cases such as In re Salomon, Inc., Shareholders' Derivative Litigation, Fed. Sec. L. Rep. ¶ 98,454 (S.D.N.Y.1994), affirmed, 68 F.3d 554 (2d Cir.1995), that, pursuant to the 600 series of Arbitration Rules of the NYSE, the NYSE board of directors has the discretion to determine that this dispute is not suitable for arbitration by it. In that regard, the NYSE will not be constrained by the "artificial" nature of the contract that we and the trial court have been called upon to apply. Accordingly, it is prudent that the trial court retain jurisdiction pending a decision by the NYSE concerning whether it will accept this dispute for arbitration. Therefore, we reverse that aspect of the trial court's order dismissing the case with prejudice.
In summary, the judgment in this case is affirmed in part and reversed in part, as noted, and the case remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOUSTON, LYONS, BROWN, WOODALL, and STUART, JJ., concur.
JOHNSTONE, J., concurs in the rationale in part and concurs in the judgment.
MOORE, C.J., concurs in the result in part and dissents from the rationale.
JOHNSTONE, Justice (concurring in the rationale in part and concurring in the judgment).
But for two exceptions, I concur in the scholarly main opinion. I will explain the exceptions, but they do not impair the validity of the remainder of the main opinion or the validity of the judgment.
First, I respectfully disagree with the judicial notice and per-se-interstate-involvement holdings in Part VI. I agree, however, as a matter of fact supported by the evidentiary materials of record in this case, that the particular Form U-4 in this case evidenced a transaction which substantially affected interstate commerce.
Second, I respectfully disagree with the holding in Part X that Oakley did not substantially invoke the litigation process. In my opinion, a person's either suing or countersuing another person is a substantial invocation of the judicial process. I agree, however, that Lewis did not establish that he was substantially prejudiced by Oakley's countersuit.
MOORE, Chief Justice (concurring in the result in part and dissenting from the rationale).
I agree with the majority that this case should not have been dismissed. However, I respectfully dissent from the main opinion's affirmance of the trial court's order compelling arbitration in this case. I believe that the only agreement in this case that should be considered in determining whether arbitration should be granted is the Purchase Agreement between Milton Lewis and Lawrence Oakley, *331 because that agreement is the basis for Lewis's action. That agreement contains a merger clause that should preclude consideration of the Form U-4 on the issue of arbitrability. However, even if the Form U-4 is included as part of the agreement between the parties, I disagree with the conclusion that the agreement permits arbitration of disputes between these parties, per my dissent in Selma Medical Center, Inc. v. Fontenot, 824 So.2d 668 (Ala.2001), because of the continued misapplication of the "substantial-effect" test to arbitration cases. Moreover, the Purchase Agreement does not contain an arbitration clause; that fact provides the clearest indication that there was no intention by the parties to have any disputes pertaining to the agreement determined through arbitration. For these reasons, I must dissent from the affirmance of the order to compel arbitration.
Because I believe that the motion to compel arbitration should not have been granted in this case, I agree with the majority that the case should not have been dismissed, but for a different reason. Therefore, I concur in the result insofar as it reverses the trial court's dismissal of this case.
NOTES
[1] We infer from the record that a broker's "book of accounts" is an inventory of the investment holdings of clients whose accounts that particular broker services.
[2] Specifically, Lubin stated, "Per our conversation on January 26, 1998, it is my understanding that you will retire April 1, 1998. On March 24, 1998 you will transfer your accounts into pool number 2675 and on that date the pool number converts to 100% payout to Lawrence Oakley. As per your request, you will maintain your office and Kim/Michelle until May 30, 1998 in order to assist Lawrence in transferring clients."
[3] In his complaint, Lewis also averred that Merrill Lynch had learned of Oakley's negotiations with Morgan Stanley looking toward his leaving Merrill Lynch and becoming "a financial consultant with Morgan Sanley," and, as a consequence, had "required him to leave immediately, whereupon Defendant Oakley immediately moved into his office at Defendant Morgan Stanley...."
[4] We note that despite the fact that Merrill Lynch's motion requested only a stay pending arbitration, without actually moving the court to compel arbitration, the parties and the trial court consistently treated the motion as one seeking to compel arbitration. Accordingly, we will refer to it simply as the "motion to compel arbitration."
[5] See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 22-25, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); SouthTrust Sec., Inc. v. McClellan, 730 So.2d 620 (Ala.1999); and Ex parte McKinney, 515 So.2d 693 (Ala.1987).
[6] Lewis did subsequently include in his August 30, 2000, filing captioned "Plaintiff's Response To Motion To Strike and Request For Leave To File Reply Of Defendant Merrill Lynch, Pierce, Fenner & Smith" an assertion that the Matisak affidavit ran afoul of the requirement of Rule 6(d), Ala. R. Civ. P., because it had not been served with the motion to compel arbitration. That belated mention of additional support for Lewis's motion to strike represents a "Catch 22" for him. If that late filing can be overlooked, to allow supplementation of the motion to strike by adding an entirely new ground, then, arguably, so should the alleged late filing by Merrill Lynch. If Lewis's motion to strike could be supplemented after the fact, Merrill Lynch has an additional basis for arguing that its motion to compel arbitration could be supplemented after the fact.
[7] At the time this opinion was issued, those NYSE Rules of Arbitration could be found on the NYSE's Web site at http://www.nyse.com.
[8] We emphasize again, we are dealing solely with the contract presented by the record on appeal and the parties in their appellate briefs, just as the trial court was dealing with what it had before it and what was included in the trial court briefs.